FILED
DALLAS COUNTY
2/13/2017 11:37:21 AM
FELICIA PITRE
DISTRICT CLERK

Tonya Pointer

CAUSE NO. DC-16-15634

| | | |
|---|---|---|
| BEHROUZ BAGHERI and<br>METCO ENGINEERING, INC. | § <br> § <br> § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § <br> § | |
| VS. | § <br> § | 298TH JUDICIAL DISTRICT |
| THE CINCINNATI INSURANCE<br>COMPANY | § <br> § <br> § | |
| *Defendant.* | § <br> § | DALLAS COUNTY, TEXAS |

### PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION AND REQUEST FOR DISCLOSURE TO DEFENDANT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COME NOW, BEHROUZ BAGHERI and METCO ENGINEERING, INC.**, Plaintiffs in the above-styled action, and file this Amended Original Petition and Request for Disclosures, and complain of The Cincinnati Insurance Company, Defendant, and in support would respectfully show this Court the following:

### DISCOVERY-CONTROL PLAN

1.      Plaintiffs intend to conduct discovery under Level 2 of Rule 190.3 of the Texas Rules of Civil Procedure, and affirmatively plead that this suit is not governed by the expedited-actions process in Texas Rules of Civil Procedure 169 because Plaintiffs seek monetary relief over $100,000.

### RELIEF

2.      Plaintiffs seek monetary relief over $1,000,000 including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees.  The damages sought in this action are within the jurisdictional limits of the court.  *Tex. R. Civ. P. 47(c)(5).*

PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION AND
REQUEST FOR DISCLOSURE

EXHIBIT
E

Page 1

## PARTIES

3.     Plaintiff Behrouz Bagheri, (hereinafter "Plaintiff Bagheri"), is an individual residing in Dallas County, Texas.  The last three numbers of his Texas Driver's License number are 360; the last three numbers of his Social Security number are 374.  *Tex. Civ. Prac. & Rem. Code* § 30.014(a).

4.     Plaintiff Metco Engineering, Inc., (hereinafter "Plaintiff Metco"), is a Texas corporation whose address is 3333 Lee Parkway, Suite 600, Dallas, Texas 75219.

5.     Defendant, The Cincinnati Insurance Company, (hereinafter "Defendant Cincinnati Insurance"), upon information and belief, is a domestic insurance carrier authorized to conduct insurance business in Texas.  Defendant Cincinnati Insurance may be served with process by serving its registered agent, National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas, 75201, by private process.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the parties and the matter in controversy is within the jurisdictional limits of this Court.  Pursuant to § 15.002 *et seq.* of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County.

## FACTUAL BACKGROUND

7.     Plaintiff Bagheri is a professional engineer who contracts with several governmental agencies to provide engineering services through his company, Plaintiff Metco.

8.     On or about December 7, 2014, at 2:40 A.M., Plaintiff Bagheri realized his vehicle had been stolen while parked at an Exxon service station located at 8201 East R.L. Thornton Freeway, Dallas, Texas, and he immediately contacted the Dallas police.

9.     A police officer arrived at approximately 4:00 A.M., took note of Plaintiff Bagheri's driver's license information; and asked him a series of questions regarding the circumstances surrounding the incident, including whether he had his vehicle key with him.

10.    Plaintiff Bagheri did not remember that he had two vehicle keys in his pocket initially (both main and spare keys). Since Plaintiff Bagheri had one key still in his pocket at that time, and did not realize the other one was in the vehicle, he answered "yes" to the officer's question.

11.    The officer also asked Plaintiff Bagheri what his address was. Plaintiff Bagheri provided the officer with his correct address and advised the officer that his address had recently changed and was different than the address on his driver's license. Later Plaintiff Bagheri discovered that his old address was reported on the police report.

12.    The police officer also asked Plaintiff Bagheri of the location of his vehicle when it was stolen. Plaintiff Bagheri told the officer it was stolen at the same location where he was standing and giving the report, and he showed the officer the camera in the gas station pointing at the location where his vehicle was stolen.

13.    Unbeknownst to Plaintiff Bagheri, his vehicle was found by the police at 200 West Malloy Bridge Road, Seagoville, Texas, on December 9, 2014, two days after the incident. Plaintiff Bagheri was not informed of this.

14.    Although the address on Plaintiff Bagheri's driver's license was for his previous residence in Allen, Texas, all of his mail was being forwarded to his new residence in Dallas, Texas at the time of the incident.

15.    Plaintiff Bagheri never received any letters or phone calls from the police or his insurance company that his vehicle had been found.

16.     On December 16, 2014, Plaintiff Bagheri filed a claim with Defendant Cincinnati Insurance.

17.     On December 26, 2014, at or around 12:30 P.M., two of Defendant Cincinnati Insurance's agents arrived at Plaintiff Bagheri's office located at 1202 Richardson Drive, Suite 300, Richardson, Texas, to question him about the claim.

18.     The agents said the reason for their visit was to verify and adjust the claim and they proceeded to interrogate Plaintiff Bagheri about how the incident occurred.

19.     The agents asked if Plaintiff Bagheri still had the key to the vehicle. Since Plaintiff Bagheri knew by then the reason he found the vehicle key in his pocket on the date of the incident, Plaintiff Bagheri explained to the agents why he told the police officer that he had the vehicle key with him. The interrogation of Plaintiff Bagheri continued for approximately one hour.

20.     At the end of the interrogation, the agents informed Plaintiff Bagheri that his vehicle had been found on December 9, 2014, and they requested that he send a written request withdrawing his claim.

21.     Plaintiff Bagheri asked the agents why they did not inform him that his vehicle had been found, which they did not answer. (See Exhibit A).

22.     Plaintiff Bagheri proceeded to e-mail his insurance agent, Stacey Glick, on January 1, 2015 and withdrew his claim. On the same day, Plaintiff Bagheri received a call from his company's bonding agent, Mike Hill, with whom he had been doing business with since 2008, informing Plaintiff Bagheri that the bonding agency would not be issuing a bond to cover his current or future projects.

23.     Plaintiff Bagheri was informed that he was under investigation by Defendant Cincinnati Insurance for allegedly filing a fraudulent insurance claim, and that the surety company

had a policy not to issue bonds to any company which was under investigation, and until such legal claims were resolved.

## COUNT I: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

24.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

25.     Plaintiff Bagheri's vehicle was covered by insurance

26.     Plaintiff Bagheri was denied coverage by Defendant Cincinnati Insurance for the vehicle when liability was reasonably clear from the circumstances provided. *See Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 72 (Tex. 1997) (bad faith clearly encompasses insurer's denying or delaying payment of claim when insurer knows, at least with substantial certainty, that he has no reasonable basis for doing so).

## COUNT II: CONVERSION

27.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

28.     Plaintiff Bagheri owned, possessed, or had the right to immediate possession of the property in question.   The property was his personal property, Defendant Cincinnati Insurance wrongfully exercised dominion or control over the property, and because of this, Plaintiffs suffered injury.

## COUNT III: NEGLIGENT MISREPRESENTATION

29.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

30.     Defendant Cincinnati Insurance provided information in the course of business, or in a transaction in which they had a pecuniary interest; the information supplied was false;

Defendant Cincinnati Insurance did not exercise reasonable care of competence in obtaining or communicating the information; Plaintiff Bagheri justifiably relied on the information and Plaintiffs suffered damages proximately caused by the reliance on the false information.

## COUNT IV: UNJUST ENRICHMENT

31.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

32.     Defendant Cincinnati Insurance was enriched at Plaintiffs' expense.  Defendant Cincinnati Insurance unjustly or unfairly obtained property for which it should expect to pay.

## COUNT V: FRAUD

33.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

34.     A material representation was made to Plaintiff Bagheri.   The material representation was false.  When the material representation was made, Defendant Cincinnati Insurance knew the material representation was false, or Defendant Cincinnati Insurance made the material representation recklessly, without any knowledge of its truth and as a positive assertion; Defendant Cincinnati Insurance made the material representation with the intent that it should be acted upon by Plaintiffs.  Plaintiffs acted in reliance upon the representation and Plaintiffs suffered injury or damage.

## COUNT VI: TEXAS INSURANCE CODE VIOLATIONS

35.     Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

36.     Defendant Cincinnati Insurance has violated the current Tex. Ins. Code Chapter 541 by engaging in one or more of the following acts or practices:

a.   Engaging in unfair and deceptive acts or practices in the business of insurance, in violation of *Tex. Ins. Code* § 541.003;

b.   Making an untrue statement of material fact in violation of *Tex. Ins. Code* § 541.061(1);

c.   Failing to state a material fact necessary to make the other statements made not misleading, considering the circumstances under which the statements were made, in violation of *Tex. Ins. Code* § 541.061(2);

d.   Making a statement in such manner as to mislead a reasonably prudent person to a false conclusion of a material fact, in violation of *Tex. Ins. Code* § 541.061(3); and

e.   Making a material misstatement of law in violation of *Tex. Ins. Code* § 541.061(4).

### COUNT VII: DECEPTIVE TRADE PRACTICES ACT

37.   Plaintiffs reallege and incorporate by reference the preceding paragraphs for all purposes the same as if set forth herein verbatim.

38.   Plaintiffs and Defendant are a "person" as defined by *Tex. Ins. Code* § 541.002(2).  Defendant Cincinnati Insurance engaged in an act or practice that violated (1) *Tex. Ins. Code* Chapter 541, subchapter B; (2) *Tex. Bus. & Com. Code* § 17.46(b) and Plaintiffs relied on that act or practice to their detriment; or (3) a tie-in provision of the *Tex. Ins. Code*.

39.   Defendant Cincinnati Insurance violated the Texas Deceptive Trade Practices Act when Defendant used or employed an act or practice in violation of *Tex. Ins. Code* chapter 541 as explained herein.

40.   Defendant Cincinnati Insurance's wrongful conduct was a producing cause of damages to Plaintiffs.

41.   Plaintiffs' seek recovery of unliquidated damages, mental anguish damages, and attorneys' fees within the jurisdictional limits of this court.  Defendant Cincinnati Insurance acted knowingly, which entitles Plaintiffs' to recover treble damages under *Tex. Bus. & Com.*

*Code* § 17.50(b)(1).

## DECEPTIVE TRADE PRACTICES ACT NOTICE

42.     Defendant Cincinnati Insurance has been provided written notice before the filing of this suit advising in reasonable detail Plaintiffs specific complaint and the amount of economic damages, damages for mental anguish, and expenses, including attorneys' fees reasonably incurred by the Plaintiffs.   However, waiting until after 60 days written notice before filing suit was rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations. *Tex. Bus. & Com. Code* § 17.505(a)-(b)

## ACTS OF AGENTS

43.     An allegation that Defendant engaged in any act or practice means:

     a.     that a Defendant performed, authorized, or participated in the act or practice; or

     b.     that one or more of the Defendant's officers, agents, representatives, or employees performed or participated in the act or practice on behalf of and under the authority or direction of the Defendant.

## JURY DEMAND

44.     Plaintiffs hereby respectfully demand a trial by jury and tenders the appropriate fee contemporaneous with the filing of this action.

## REQUEST FOR DISCLOSURE

45.     Pursuant to Texas Rules of Civil Procedure 194, Plaintiffs request Defendant to disclose, within fifty days after date of service of this Request, the information and the material described in Rule 194.2(a) through (l).

## PRAYER AND REQUEST FOR RELIEF

46.   For the foregoing reasons, Plaintiffs request that the Court issue citation for Defendant to appear and answer, and that Plaintiffs recover judgment against Defendant for the following:

(a)   all damages requested;

(b)   pre-judgment and post-judgment interest as provided by law;

(c)   costs of court;

(d)   attorneys' fees;

(e)   such other and further relief, at law or in equity, to which Plaintiffs are justly entitled.

Respectfully submitted,

_____
**J.T. LANGFORD**
Texas Bar No. 11911700
**ERIC A. DOUGLAS**
Texas Bar No. 24097620

**LANGFORD, WISE & FARAHMAND, PLLC**
5101 Ross Ave., Suite 200
Dallas, Texas 75206
Phone: (214) 613-2929
Fax: (214) 613-2541

Email: langford.j@sbcglobal.net
        eric@langfordandwise.com

**ATTORNEYS FOR PLAINTIFFS'**
**BEHROUZ BAGHERI and METCO**
**ENGINEERING, INC.**

April 24, 2015

Claim:                          #2351850
Insured:                        Metco Engineering Inc.
Date of Loss:                   12/07/2014

All right. The recorder is on. Let me give you some information we're going to start with here. My name is Tracy Kensing. I'm with The Cincinnati Insurance Companies and with me today is our Claims Adjuster Ms. Stacey Glick.

Q.    I think you've had conversation with her before

A.    Yes we have

Q.    And our conversation is being recorded with your permission is that correct

A.    Sure yes

Q.    Okay today's date is December 29th 2014 it is approximately 11:09 a.m. we're here discussing our Claim Number which is 2351850 our policyholder is Metco Engineering Incorporated the date of loss on this particular claim which is December 7th 2014 which was a Sunday and our customer and claimant is Mr. Barry Bagheri Bagheri I'm sorry

A.    Bagheri yes

Q.    Okay and Mr. Bagheri if you would just for the record state your full name and spell your last name for me and just provide your date of birth please

A.    Yes my my full name Behrouz spelling is b-e-h-r-o-u-z I go by Barry b-a-r-r-y my last name is Bagheri the spelling is b-a-g-h-e-r-i and my date of birth date of birth is March 30th 1956

Q.    Thank you appreciate that and I also want to say I appreciate you taking time out of your busy day to meet with us today we'll try to make this as brief as possible

A.    Yeah

Q.    Just to start off we've never met so I don't know a whole lot about you and just to kind of get some background you and and your business and what you do

A.    Sure

Q.    You're an engineer that's correct what what type of engineer is that

A.    I'm a practice is control and electrical engineer

Q.    Electrical okay

A.    Yeah

Q.    And how many years have you been in business

A.    Metco been in business for ten years more than ten years

EXHIBIT "A"

Claim #2351850
Page 2
April 24, 2015

Q.     Is this your primary office or do you have satellite offices in other states or how
       how does your corporation work

A.     The corporation based in Dallas but we trying to get more business out of the
       state

Q.     You're trying to spread out in other states

A.     Yeah

Q.     Okay how many employees do you have

A.     It depends on the job I it depends on the projects I got and most of my
       employees are _____ contractor and depends on projects we work sometimes
       goes up to 25 to 30 sometimes it's _____ to five but we probably

Q.     So it fluctuates

A.     Yes exactly

Q.     Depending on on the type of jobs and business

A.     Yes

Q.     Are you staying busy got plenty of business is financial things are good with your
       company

A.     Yes we are we are having the same yeah we are good we are dealing with cities
       and the schools all the time

Q.     Schools and who

A.     And city

Q.     Oh city okay

A.     City and government yeah

Q.     Okay personally are you single married divorced

A.     Yeah I'm living with someone but not yeah yeah I mean marriage

Q.     You're married

A.     Yeah I mean but not I mean what do you mean _____

Q.     I'm not trying to get into your personal

A.     _____

Claim #2351850
Page 3
April 24, 2015

Q.     Just you know either

A.     I mean this question is you know I mean if you live with someone you take you consider it as married is even though you don't have the paper

Q.     Common law yeah

A.     Common law

Q.     Okay yeah that's fine

A.     That's that's _____

Q.     What is your current address for your residence there's and I'll bring this up something a little later we got a couple of different addresses

A.     My my home address I'm I'm living at Turtle Creek is 3225 Turtle Creek in Dallas
       _____

Q.     Okay well let's let's just get to the the meat of the topic here we're we're dealing with a claim for a a stolen vehicle your 2007 BMW

A.     2007 yes

Q.     Reported stolen to the Dallas Police Department on December 7th of 2014 and just a in your in your own words kind of paint of picture of what happened that night you know where you you know where you were where you were coming from where you were going and and what you saw and then we'll proceed from there

A.     Yeah I I guess you got everything in the police report do you

Q.     I do have a police report yes sir

A.     Okay so what else do you need to know

Q.     I just wanted to hear from you so I can have it on on a statement what what took place that's that's all

A.     We are parked at gas station I went to Denny's Restaurant and back to the same place my car then disappeared and then I called the police

Q.     That's

A.     That's it

Q.     Pretty much

A.     Pretty much to it

Claim #2351850
Page 4
April 24, 2015

Q.    Okay let me ask you about the the Dallas report did a marked Dallas Police
      officer respond or was this a phoned in report

A.    No they came to the job to to the place of

Q.    Location

A.    Yeah I was waiting for police for more than three two two-and-a-half to three
      hours to to show after called them back and they he's got a report and you know
      he come to this place and that's it

Q.    You waited two-and-a-half to three hours for for the police

A.    it's two hours it's about two hours that's what they said because they were
      changing the shift and it was

Q.    What time did you call them approximately I don't need

A.    Around around two o'clock maybe or 1:30 or two two _____ to two between
      two two _____

Q.    1:30 to two

A.    Yeah I think it's around that area about two 2:30

Q.    So you

A.    After after I I _____ and the police report I'm not sure is about four four in the
      morning what time is

Q.    The Dallas Police report indicates that this was reported at 4:04 a.m.

A.    Yeah around that area

Q.    So is that what time the officer showed up

A.    Yes that's the officer showed up

Q.    And they're indicating on their report and I'm assuming this is information that
      you provided to them that the occurrence the theft occurred some time between
      2:40 a.m. and four o'clock when they arrived I'm

A.    Yeah around that area yeah should be should be

Q.    What time what time did you did you walk out and notice your car gone

A.    Pardon

Claim #2351850
Page 5
April 24, 2015

Q.   What what time did I mean I know that you you said you contacted them around 2:30 is that when you noticed your car was gone

A.   Yeah around that area yeah

Q.   So you immediately called them

A.   Yeah

Q.   Okay

A.   Yeah the most it was total of 30 or 40 minutes while I was at the Denny's Restaurant _____

Q.   I want to ask some more detailed

A.   Sure

Q.   Question about the night if you wouldn't mind enlightening on a few areas here that particular night I mean we're it's what Sunday night or Sunday morning it's

A.   Uh-huh

Q.   You know early morning hours where where had you been that night where you coming from when you parked at the the service station or Denny's

A.   Well I went I went I was out came home was hungry and decided to go back to to eat something and that took me about to find a Denny's which is they're open 24/7 and I stop by and I went there and and you know get get something to eat and come back

Q.   So you'd been out that night you

A.   Yes

Q.   Went home and

A.   Yeah

Q.   Decided to

A.   Decided to

Q.   You know go find go out find something to eat

A.   Yeah

Q.   So but you were looking specifically for a Denny's Restaurant

A.   No not really I saw a Denny's I saw

Claim #2351850
Page 7
April 24, 2015

Q.    Yeah

A.    No no I drove with the with Vanessa and then she left she was waiting for her friend to come and pick her up at the same place and they joined she joined and she left she was waiting after I called her the police she was there

Q.    She was there when the police came

A.    Yes you have you can look at these if you wanted to go to the gas station and pull up you already and and the camera is already there I didn't do anything but

Q.    Okay

A.    But just in case if you need more information you can get it

Q.    I've been I've been to the 7-11 and and the Denny's I just I checked out the

A.    Sure

Q.    The area to see what it looked like because I you know I had never been there before so

A.    Me too I never been there I realized that that wasn't a very good area when I stopped by

Q.    Yeah

A.    It's kind of a rough area

Q.    Could be looks like it might be

A.    But you know usually 7-11 is shouldn't be that bad next to the highway and very high traffic

Q.    I've got is it all right if I just call you Barry

A.    Sure

Q.    Okay I've got a satellite view of that this is a small one I'm going to show you a bigger one in a moment but this is that 7-11 right here

A.    Yes

Q.    That's that's the awning where the gas pumps are

A.    Yes

Q.    And this is the Denny's

A.    That's the Denny's

Claim #2351850
Page 8
April 24, 2015

Q.   Denny's right here

A.   Yes

Q.   Okay I just need if you don't mind I'm going this is a little larger photo turn around so you can see Denny's 7-11 can can you show me where you parked I I just

A.   Absolutely if you leave it like that this is the 7-11 I park here I park this area and that's the Denny's that's that's the Denny's is that right

Q.   Denny's is right here

A.   Exactly I walked

Q.   See

A.   In here and come back here and I went _____

Q.   Okay so you parked about right here

A.   Yes

Q.   Okay did did you

A.   And I met the police exactly at this location too I ask them to come I ask them to come to this location I showed him exactly where that and also there's a camera sitting here

Q.   Okay did when you parked when you pulled in here and you parked did you did you go into the 7-11 or did you go straight to

A.   I straight went to Denny's but I went back to 7-11 I guess I I mean that was I didn't go to 7-11 at that time I went to Denny's

Q.   Okay so you parked went straight to Denny's

A.   Yes

Q.   Do you this is a time that I'm not aware of do you know what time it was when you when you got there initially about what time you you actually arrived at at the 7-11 before you went in to eat at Denny's

A.   I'm not sure maybe it's the same time it wouldn't take me the whole process it wouldn't take me more than 30 35 minutes because you stay in a Denny's for a long time I went there for eat

Q.   Well I understand you went there to eat I I just time to get I'm not going to pin you down to an exact minute but

A.   Well

Claim #2351850
Page 9
April 24, 2015

Q.    At the time when you arrived I'm I'm just trying to I'm trying to get a timeline

A.    Let's just say around two 2:30 around that area

Q.    About 2:30

A.    Yeah I went there

Q.    Okay let me clarify what you told me make sure I'm understanding it so you you arrive about 2:30 you're with a young lady Vanessa

A.    Uh-huh

Q.    And

A.    Not very young

Q.    Okay you're with a lady

A.    Yeah

Q.    By the name of Vanessa

A.    Yeah

Q.    And you pull into 7-11 and this is the area you parked

A.    Uh-huh

Q.    And you go to Denny's and and I'm assuming you sat down and had a meal

A.    Sure

Q.    Cause you said you decided you were hungry at that time

A.    Yeah

Q.    And finished your meal you came back outside and and your your car was missing and then at that point you called Dallas Police to report a theft

A.    Absolutely

Q.    Did when you went back to the the location where you had parked and your car was missing did you notice any glass broken glass on the ground

A.    No nothing nothing I know I don't

Q.    I haven't driven a BMW like what you had stolen so I'm not familiar with the ignition can you tell me is it a pushbutton type start

A.    It's a pushbutton type start and it got the it's a pushbutton yeah the remote

Claim #2351850
Page 10
April 24, 2015

Q. Remote keyless type deal

A. Keyless

Q. Just as long as that's in close proximity of the vehicle

A. That's right

Q. Then you can start the car

A. Yeah

Q. Do you have those those key fobs still for that vehicle

A. I have only one set of key I believe that key was left at somewhere or drop it at my pocket or something I'm not sure the the key the key you're talking about

Q. The key fob

A. Yeah I do have it

Q. The remote you do have one

A. One

Q. You don't have two

A. No I don't have two

Q. You what happened to did you have two originally

A. I had two originally and I couldn't find the one I had it in my in my pocket probably it's been fell down or somehow

Q. When did you lose that that key

A. It should be the same time I park my car I'm not sure

Q. Oh what on this same night

A. Yeah the same yeah because I hide it and then I I lost it somehow it was that that was happen

Q. When did you notice that that you didn't have your key

A. When I didn't see my car and then said oh okay because usually

Q. So you have both you had two two key fobs with you that night

A. No no only one the other fob the other one is at my home

Claim #2351850
Page 11
April 24, 2015

Q.   Okay so when you parked you went in and and but you noticed you missed you were missing your key the the Dallas Police report

A.   No I didn't miss my my key at that time I already had this set of the key with me

Q.   You had it

A.   Yeah

Q.   You had it when the police arrived

A.   No I didn't no

Q.   I'm looking at the Dallas report

A.   Yes sir

Q.   Says here the complainant which would be you had his keys and stated his car was locked he said the Dallas officer

A.   The car was locked a car is open _____ locked

Q.   Okay but he the Dallas report says you had your keys when they when they took the report

A.   Have my keys with me

Q.   I'll let you read it sir I'm I'm just telling you what's in the report that you provided the information to the Dallas Police Department

A.   I'm not sure the key was the key is not the key of this vehicle was _____

Q.   Did you that's a typical question a investigating officer would ask you do you have your keys

A.   Uh-huh

Q.   To determine if there was any

A.   It's usually the key is in my in my pocket and the car is automatically locked

Q.   I understand

A.   Okay

Q.   The Dallas officer is going to ask you do you have your keys to your vehicle that's that's that's a common investigative question for for an auto theft

A.   Sure

Claim #2351850
Page 12
April 24, 2015

Q.    And they're they're _____

A.    Probably I mentioned the spare keys maybe is the _____ not not not the key
      itself because there is two keys they got two remote control keys so

Q.    Okay

A.    That's that's one that's one _____ .

Q.    Where where's the second one

A.    The second one is my home

Q.    Okay

A.    I can give it to you

Q.    I have a question on the police report

A.    Yes sir

Q.    You provided your an address in Allen Texas

A.    Yes my

Q.    Shade Tree Lane

A.    Shade Tree no is my the my this is my old address

Q.    Uh-huh

A.    And is on my driving license

Q.    Uh-huh

A.    The new address I'm living at Turtle Creek I haven't changed my address on my
      driving license yet but that was the police write it down on my on my driving
      license

Q.    Okay how long has it been since you

A.    Four months two four months

Q.    Why would you change your address

A.    Didn't have time I just I just notified that and I realize I I didn't know I have to
      change it and then I'm going to do it

Q.    Would you not have notified the police officer that that's not my correct address

A.    I already said that yes yeah but he write it down on _____

Claim #2351850
Page 13
April 24, 2015

Q.   So he wrote it down

A.   _____ just just notify on my driving license still is there there you go that shows Shade Tree Lane that's old address

Q.   This

A.   I used to live in this address for ten years so still I'm getting lots of emails and you know mails and something but that _____

Q.   Okay when you bought that vehicle I believe it was in 2009 you bought it was a used vehicle

A.   Yes

Q1.  Seven

A.   2000 the car

Q.   It's an '07 vehicle

A.   It's '07

Q.   But I think it was purchased in

A.   2009

Q.   2009

A.   Around that area yeah

Q.   Was that a straight up purchase or did you did you trade it in trade another vehicle in or did you just purchase

A.   No just purchase

Q.   Okay I'm looking at this Proof of Loss Avadavat show it you completed and provided one of the questions was the was the purchase price and you indicated you paid $70,000 for the vehicle is that correct

A.   No the value worth $70,000

Q.   No this says purchase price

A.   Maybe it's the wrong one is I didn't purchase it for $70,000 at that time it worth $70,000 when I purchase it 67,000

Q.   You got a heck of a deal then

A.   I got a very good deal

Claim #2351850
Page 15
April 24, 2015

Q.   Is that right

A.   That that sounds right yeah

Q.   Okay

A.   They they this dealer they had so many different name on it

Q.   I'm looking at a record here this is through the state system on registration on that vehicle

A.   Sure

Q.   And they show the sale price this is what was listed by whoever you bought it from

A.   Uh-huh

Q.   And this is taxing purposes is what they list there

A.   Uh-huh

Q.   For that vehicle is $40,605

A.   $40,605

Q.   Yes does that ring a bell

A.   No that should be more because I've got $40,000 on

Q.   Finance

A.   Finance but I don't know sometimes it may be less I just whatever is the actual cash value

Q.   Well see that's what I'm trying to

A.   Yeah

Q.   I'm trying to understand

A.   I don't

Q.   The value and the cause you know we're looking at value based on your you know that's all relative to your claim so

A.   Uh-huh

Claim #2351850
Page 16
April 24, 2015

Q.   I've got too many numbers floating around

A.   It's always on a car you got too many numbers with the cars depends what you want I mean how do you want I mean have you ever been to the dealership to buy a car it's

Q.   Oh yeah

A.   There's always the price _____

Q.   And these are these are pretty much factual I mean this is what I paid for it

A.   Sure

Q.   This is what it's worth today

A.   No I paid I paid more I got $40,000

Q.   Like I said I got a value at 70,000 and I've got now you're telling me you paid around 50 for it and and that's what is was here but and then I'm looking here at the actual information that's provided to the state for taxing purposes as the sale price of 40,605 there's a lot of discrepancy here so

A.   Yeah probably that this is _____

Q.   I'm trying I'm trying to sort it out

A.   Yeah sure I mean _____

Q.   Why'd you park at 7-11 and not over there towards Denny's

A.   Because it wasn't it was so crowded there so I thought is a better place and then I just pull into and that's it because if you come from this way it goes here but it goes to that way you have to go around and go so just walk to 7-11 and walk here

Q.   Had you ever been there before

A.   No first time I just saw the Denny's here and then I park it here

Q.   Did you

A.   Because I didn't want to I wanted to go to 7-11 after I done my my my _____

Q.   You did want to go to 7-11

A.   I went there to 7-11 I was waiting there for two hours I mean here you I I was inside the 7-11 for waiting there for two hours and see the police

Claim #2351850
Page 17
April 24, 2015

Q.    Okay I got another question reference

A.    Yes sir

Q.    Going into 7-11 and I'm reading this from the affidavit of vehicle theft that you provided to us

A.    Sure

Q.    And it says briefly describe the details of the theft and it says park in gas station parking lot which the gas station is what you're is is what you're referring to is is the 7-11

A.    Yeah

Q.    At the above address and went it says you parked went into the gas station and then to Denny's next door to eat

A.    Probably yeah

Q.    But previously you told me that you parked and went straight to Denny's so I'm I'm confused

A.    I'm I mean this is back in about what is about just matter of these few few things I don't know I have to look at it I have to see which one I did I go went to there or go to the gas station because usually I can't remember

Q.    Okay

A.    Just matter of a few minutes you know there and there

Q.    How did you backing up a couple steps here

A.    Sure

Q.    And I know you said you got hungry that that early that morning

A.    Uh-huh

Q.    And decided to go grab a bite and you came from the downtown area of Dallas did you just drive until you found something or did you pull it up on your phone to find a location of a Denny's I know they're all night restaurants

A.    I can't remember I was I was heading to to a stop by and the there was a Vanessa was with me and here friend suppose to pick her up that's was we stopped there to stop and grab the bite and

Q.    Where where was where does Vanessa live where does

A.    She lives in Houston

Claim #2351850
Page 18
April 24, 2015

Q.     She's from Houston

A.     Yeah

Q.     Is she just a friend

A.     Just a friend

Q.     Acquaintance

A.     Just a friend a close friend and I met her

Q.     Was she at your house before you came to

A.     Uh-uh no she wasn't in my house _____ .

Q.     Where was her friend coming from to pick her up

A.     From from her job finish at Sambuca (?) she was she was she was working at
        the place

Q.     What's the name of the is this a restaurant

Q1.    On Kennedy Avenue downtown restaurant

A.     It's a restaurant she works there and they're friends and they try to pick her up
        from from that area and she lives in Rockwell up at _____ address _____ so it
        was the on the way so I was trying to stop by and grab the bite and pick her up

Q.     Are you are you current on your premiums with with the for your insurance
        policies are they are they paid up

A.     I think so I mean the it goes straight yeah it should be is that is that any

Q.     I don't know

A.     I don't know yeah it should be

Q.     I'm not trying to get real deep in personal issues here I just trying to make things
        reasonable in my mind here

A.     Sure

Q.     You said you live with a lady but you don't live with Vanessa that's this is

A.     Of course not

Q.     Okay

A.     No she's a friend

Claim #2351850
Page 19
April 24, 2015

Q.  Okay but your lady friend that you live with

A.  She

Q.  She didn't want to come go out to eat with you all or or she was

A.  Not really she she's in she was in California at that time

Q.  Oh she was out of town

A.  Yeah she was out of town

Q.  Okay

A.  Yeah there is no relationship between me and her anyway I mean just a friend

Q.  Vanessa

A.  Yeah of course I had no no no connection or not whatsoever with her or anybody else

Q.  Do you do you have some contact information for her so I could talk to her and

A.  I can give you the contact information

Q.  What's Vanessa's last name do you know

A.  Yes I know Pequeno but I give you the right spelling hold on a second

Q.  You said she's from Houston

A.  Yes she lives in Houston yes Vanessa Pequeno p-e-q-u-e-n-o

Q.  You have a phone number for her

A.  I do have a phone number but I'm not sure this is the this is the work phone number or cell phone it's 8 832 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

Q.  Hold on I have 832-73 I'm missing a character or something

A.  832-738-8764

Q.  8764 okay very good

A.  Yeah may I ask what kind of question you want to ask her

Q.  Sure I just basically see what she saw and observed and you know

A.  Absolutely

Claim #2351850
Page 20
April 24, 2015

Q.    Verify that that that end with her since she appears to be a witness I always like to talk to witnesses

A.    Absolutely

Q.    About about things

A.    Yeah she was waiting there for two hours with me to to wait for police and she you know to to

Q.    I thought somebody picked her up and took her

A.    She was she was stay she we left when she find out she was going around and then she backed she back to see me there she was waiting there as well he left at the restaurant they park it here

Q.    Uh-huh

A.    I was parking here they went this way I went that way I find my car is missing she was coming there she saw me here she goes back and come see me that's exactly what happened after I was waiting for two hours

Q.    So she waited with you while until the police got there

A.    Yeah and her friend left

Q.    So how did you get home

A.    Taxi

Q.    Vanessa didn't offer to take you home

A.    She didn't have a car she has to got to friend to pick her up so I took her we take a taxi we get home I got another car I dropped her at her car and then we come back that's it

Q.    All right who is I got a name here u-b-e-r Uber who is

A.    That's the taxi the Uber

Q.    That's the taxi that's the

A.    Yeah where did you get this man

Q.    That's on it's just information you provided on your affidavit of vehicle theft

A.    Yeah

Claim #2351850
Page 21
April 24, 2015

Q.    That's that's I'm just going at the says how did how did you get home after theft it says Uber I didn't know if that was a name or

A.    Uber no

Q.    It didn't say taxi so

A.    Uber is a taxi

Q.    Okay

A.    Is a new App you put it in the and you're going to have it right away

Q.    All right

A.    I suggest you to have one just in case if your car gets stolen

Q.    Okay Barry let me let me let me run something by you okay

A.    Sure

Q.    I went to the 7-11 like I told you I went there

A.    Uh-huh

Q.    Looked at the location trying to get a understanding of what what actually took place that night and I've looked at video footage of the theft

A.    You did that that's good okay

Q.    Absolutely

A.    So have you seen anybody to I mean

Q.    Let me let me tell you what I'm seeing here okay

A.    Sure

Q.    There's a camera here

A.    Yeah

Q.    Here and here

A.    There's a I saw that camera

Q.    There there's three camera here

A.    I see _____

Claim #2351850
Page 22
April 24, 2015

Q.   There's some other ones out here but what I'm seeing and I'll give you some
     exact times

A.   Uh-huh

Q.   That I've noted at 2:44 a.m. Sunday morning

A.   Was it's 2:44 so it wasn't _____

Q.   I'm I'm going to say approximately 2:44

A.   Uh-huh

Q.   But that's the time that was on on their their footage

A.   Yeah yeah

Q.   I see your vehicle pull in

A.   Here yes

Q.   And park right over here I see two people get out of that vehicle

A.   Me and her

Q.   I can't tell you I couldn't give you that close a description I see two people

A.   Okay

Q.   Two individuals get out of that vehicle

A.   Uh-huh

Q.   Nobody goes to 7-11

A.   Okay

Q.   Nobody goes inside 7-11

A.   Went to straight to Denny's

Q.   Both both individuals walk straight over to Denny's

A.   Uh-huh

Q.   At 3:01 or approximately 3:01 a.m. which is about 15 minutes later I see a couple
     of individuals over here on the sidewalk

A.   Uh-huh

Claim #2351850
Page 23
April 24, 2015

Q.    From this camera view I can see your vehicle parked here head on

A.    Sure

Q.    Lights flash twice means somebody's pushing your has a key okay

A.    Oh

Q.    Yeah

A.    Okay

Q.    And an individual walks over opens the door there's no forced entry starts your car and drives off it's your car that's it's it's obvious

A.    Was it the do you how many cars been _____ do you know how many people one or two

Q.    Pardon me

A.    Two how many just only one person get in my car

Q.    One person gets in your car and drives it off

A.    And it was the male or female

Q.    It appears to be a male I don't know you tell me

A.    I don't know never I don't know but

Q.    But nobody broke into your car and

A.    No can't be broken

Q.    And and _____

A.    I didn't see any glasses or anything so

Q.    Somebody had the key

A.    Somebody had the key yeah

Q.    Yeah

A.    But the key I'm sure it wasn't with her or the girl was with me I mean absolutely don't know if they got the key or not because when I when I get out of the car I remember I was looking for I was when I was getting out of the car I was I was it was I was trying to to close the door and then she came out and then we went to the Denny's and that's it and I thought my keys with me and when I was there that's what has happened I don't

Claim #2351850
Page 24
April 24, 2015

Q.   Well let's let's step back and talk about this again there's there's several discrepancies in what's on documented information

A.   Uh-huh

Q.   Here that I'm looking at

A.   Sure

Q.   That's not matching up to what you're telling me today

A.   How come

Q.   Well you're telling me one thing and it's documented based on information you provided earlier to the police and to our company that that are not coinciding at all so I'm I'm that's why I'm wanting an explanation

A.   Yeah sure I mean go ahead I mean what

Q.   Let me let me go back to

A.   Whatever it is I mean this car been stolen with someone which I don't know what happened so I want to find out

Q.   Okay

A.   This is my car

Q.   Here's here's one that's confusing me because

A.   Sure that's

Q.   You know you're telling you

A.   Let's clear it up

Q.   There was there was somebody with you a lady friend by the name of Vanessa

A.   Yes

Q.   Here's you're here's another discrepancy this is a misrepresentation on your your affidavit of vehicle theft it says name and address of others present you say you say no none

A.   At that time when I was with the police yeah I mean

Q.   That's not what it asked it doesn't say with the police this is it you know during the incident was was anybody with you and there's no information there

A.   Okay I mean I can change that to you but that's that's what has happened

Claim #2351850
Page 25
April 24, 2015

Q.   Tell me about the the contents that we we had there there's after the fact after the police report you came back and

A.   Uh-huh

Q.   And indicated that there were computer and a tablet some other items in your car that was also stolen

A.   Yeah I got I got my I got some some of the stuff some personal stuff and my computer a prescription glasses and some other stuff in this in the car _____ and one tablet Samsung tablet

Q.   Why didn't you report that to the police when they came out

A.   It was I was so shock at that time I didn't didn't know I had to say the police tell the police all this all the stuff in my car I didn't even think about it at that time I was waiting for getting the car and getting home after two hours waiting

Q.   Let's go back to this key situation here this is this is very confusing

A.   Sure

Q.   Maybe I'm not being clear or

A.   No just make it clear I want to be I want to be

Q.   Because I and this is this is another

A.   I want to make a better statement

Q.   This is the yeah I'm reading the words as they're written

A.   Sure no problem

Q.   The complainant had his keys and stated that the car was locked that means when that police officer arrived for your to take the report for your theft he said you had the keys it says

A.   Yes

Q.   You had the keys okay

A.   Yes and then when I find out the car is stolen I didn't see my keys in my pocket that's why the guy who was there and flashing these open the door so somehow I dropped the key as I mentioned that on the way back into Denny's or somehow I I keep and dropped it from my car or from my pocket or whatever somebody pick it up and trying to whether I don't know

Claim #2351850
Page 26
April 24, 2015

Q.   And it just happened to be a car thief that that stole your BMW and just
     happened to drive it down to Seagoville it's been recovered by the way we're
     going to get to that too

A.   Oh you can find it

Q.   Let's let's talk about that

A.   Oh okay

Q.   It was driven and abandoned in Seagoville Texas which is southeast of Dallas
     here a Suburb of Dallas

A.   Okay

Q.   It was in a business parking lot down there it was recovered by the Seagoville
     Police it

A.   How long ago when when that happen

Q.   I'm getting to that it was observed there at this business by employees of the
     business the same day or probably the Monday when they came to work being
     on their their lot and it was actually let me find the it was actually towed from that
     location at the request of the Seagoville Police by this East Lake Towing which is
     out of Forney

A.   From from the gas station

Q.   No

A.   Oh

Q.   From this business in Seagoville now like I said it was it was observed there for a
     couple of days at this location it was towed on the 9th you reported it stolen on the
     7th it was it was recovered on the 9th

A.   Oh

Q.   Two days later

A.   Okay it was the car _____

Q.   So I'm trying I'm trying to be understand the whole scenario let me give you let
     me give you a little bit of background here on me I was an auto theft investigator
     for a long time and this is one of the reasons Stacey asked me to get involved

A.   Sure

Claim #2351850
Page 27
April 24, 2015

Q.   Cause I have a little bit of expertise in that in that field but I'm not trying to unreasonable cause I want I want to think like like a thief would think in the situation and say okay I happen to find this key fob and that's I'm thinking that's what you're trying to tell me that you dropped your key somewhere in that parking lot

A.   Probably I mean there's nobody and and one more thing this car is the is somebody who got a key from the _____ it's the keys around the car door can be open and can be start I mean you can start you can start the car

Q.   Okay you're thinking the key was in your pocket

A.   Yes that's the usually I don't take it out of my pocket

Q.   And now you're telling me it was in your pocket and at some cause it was in close proximity of the car somebody was able to get in it and start it

A.   That's what I thought but right now if you're telling me you got somebody flashing the car that means somebody had the key in their hand

Q.   Barry here's either you had the key with you or you didn't

A.   I find out when I lost my car I find out I do not have the key with me at that time when I when it's lost and the police report says I had the key maybe that's a spare key I had I mentioned that because got any you have any keys I said yes a spare key I do have the key so maybe maybe that conflict there

Q.   Okay let's let's go back to the scenario an individual at three o'clock in the morning happens to be walking across that same parking lot in that same path

A.   Yeah

Q.   Look and happens to find a key fob and then activates it and then walks straight to the car and gets in drives it off and then and then drive it straight to a location in the southeast part of Dallas and and abandons the vehicle what's the purpose

A.   I don't

Q.   Why why would a thief do that

A.   I don't know

Q.   I don't either

A.   I don't know that's the first time this is this is this is the this is the this is the first time I heard about it and is that have you seen the vehicle can I go and have a look at it or whatever

Claim #2351850
Page 29
April 24, 2015

Q.   I don't know

A.   I don't know

Q.   That's not what a thief would do

A.   That's right yeah I didn't I did not know my my vehicle was in so what's the how can I get my vehicle back what is the situation right now

Q.   Well the situation right now from my perspective is not being accusatory but I'm not so sure it was stolen

A.   How come

Q.   Well

A.   Who who can be sitting in that car except me and not droving without my permission to sitting in my car and drove away without even me knowing

Q.   Somebody had a key

A.   Somebody had the key here

Q.   And it's real fuzzy as to where your key was I base my understanding on what is written down in a in a police report which is typically an accurate representation of the incident

A.   Absolutely yeah I mean that's that's what I'm probably if this somebody had the key and to open the door

Q.   I would absolutely agree to that

A.   I do agree with that

Q.   And what I'm seeing here is and and is an incident where you decided one morning that you were hungry at three o'clock or 2:30 in the morning and ventured out to parts unknown

A.   Yeah

Q.   To find an all night restaurant that to me is quite a ways out of the way I think there's some all night places open closer than that but and I and I see you with another individual

A.   Uh-huh

Q.   And I based all this on what I'm I'm seeing on on video footage

A.   Sure

Claim #2351850
Page 30
April 24, 2015

Q.   I I see conflicts in in in your information provided as to going in or no I didn't go in I don't think it's that been that long we're talking about a couple weeks ago that you wouldn't remember details like like that

A.   I remember most of details but the only details I can't remember I can't remember either I went straight to Denny's or went to gas station first

Q.   Well

A.   And now the video _____

Q.   I can say you didn't go you didn't go in 7-11 _____

A.   But I went there after that I went into 7-11 and I already ask the guy to to to see if there is anybody seeing my car but nobody see it at that time I couldn't get any help from the manager of the gas station trying to look at the video but I knew that this would be but I knew that it's going to be recorded and I'm so glad you find it out

Q.   Well I don't know if that's in your benefit or not because I am you know like I said I'm seeing you drive up with another individual and I'm not real sure it's a female but I'll look a little closer when I when I go review this again

A.   Sure

Q.   So and then I'd like to talk to Vanessa

A.   Absolutely

Q.   See if she can confirm what you're telling me but then I'm seeing about a 15 minute timespan and I described earlier two individuals in this area here between the the the two the Denny's and the 7-11 I see your lights flash somebody's activating the the key fob to open the door walk in crank it up and drive it off one man

A.   Uh-huh

Q.   So I'm not real sure what what all happened that night but I don't I don't know that I'm it's a legitimate theft

A.   How do you I mean how how I'm sure that was the that was the theft but I mean what else it can be I mean somebody has stolen that car my car at that place so either legitimate or not I don't know what you mean about that what you what you

Q.   Well I think

A.   Be be more clear with this part cause

Claim #2351850
Page 31
April 24, 2015

Q.   No I'm being very clear

A.   Yeah I mean what it is I know somebody is sitting in my car flashing as I said is right there that's what you said

Q.   Yes correct

A.   As far as the video says but what else need to be done I mean what else to be think I mean I don't get it

Q.   The the information I'm understanding from what you're telling me is is very foggy there's too many I'm not sure if I don't know if I did this when and and like I said this has only been two week two weeks ago this event took place

A.   That was two weeks ago yeah

Q.   Or roughly two weeks okay

A.   Yeah so I mean what where is this part is foggy what you mean I mean just tell me which part of the work is foggy there is this this car has been stolen now it's find it out I'm glad to find out my my vehicle is parked why should I I mean this car been stolen at that time and that's what happened and I I give it

Q.   Is this the story you're you're you're sticking with then is this what you're what you're telling me today is what happened

A.   That's exactly what I told you I mean

Q.   Yeah did you have any involvement in in in that vehicle being removed from that parking lot

A.   No not at all

Q.   You have no no connection

A.   No no connection nothing I don't know anything about it that's the first thing I heard is about this whether the aftermath of this thing you telling me right now I have no involvement with anybody regarding this theft not at all whatsoever I don't know anybody in that area and that's that's what happened

Q1.   I got nothing _____

Q.   Your vehicle is in Fornay at a wrecker service I'll give you the information to contact them

A.   Sure

Q.   There doesn't appear to be any damage to it I'm sure there's some tow fees and and storage to be settled up with those folks that's just to advise you of that

A.   Can I have a location do do

Claim #2351850
Page 32
April 24, 2015

Q.    Yeah I'll give you that in just a minute we'll go ahead and conclude our our interview

A.    Sure

Q.    Do you have any questions for me

A.    No the only thing you get that information you know I want to know exactly what happened I just want to know too

Q.    Well that's the reason I'm here is to find out what happened

A.    Well I want to find out too to be honest with you I I mean I'm not I'm not into that kind of business just want to know what happened

Q.    I don't have any further questions

A.    Yes sir

Q.    I appreciate your time

A.    I appreciate your time too

Q.    And

A.    So what's my next step here I mean getting the vehicle but is that anyway we can prosecute the you have any information for the person who been stolen my car to go on after these guys

Q.    No I do not

A.    Why not I mean there is no no other way to do it or I mean you got up to this point and they got the parked car I mean is is that Fornay place that have _____

Q.    Well I'm not a police officer okay

A.    I understand I mean

Q.    That's that's up to the law enforcement people

A.    Sure

Q.    To pursue a criminal charges on that now whether

A.    So they haven't find the guy yet

Q.    Pardon me

A.    The the guy who in the stolen my my vehicle is is

Claim #2351850
Page 33
April 24, 2015

Q.   No it was unoccupied it was abandoned when they found it

A.   Okay

Q.   That's what that's what I was

A.   Oh

Q.   Discussing earlier was the fact that you know it wasn't somebody driving your car and they got stopped by the police it was parked somewhere and abandoned and that's why there was no motive here for somebody to steal your car it was just taken driven down to a location and left at a business now

A.   How far how far was from the that location to that location do you know

Q.   I don't know mileage probably 20 miles

A.   20 miles

Q.   Or more down there if if I had to guess and that's that's why that all this we talked about earlier about the discrepancies in what you've reported what you're telling me today any kind of a a motive for a thief to take a a vehicle like that and just drive it down and park it in a in a business parking lot

A.   Yeah I mean that's _____

Q.   Well if somebody says now wait if it was then found with with the wheels stripped off and you know the stereo missing that that makes sense maybe but you know that's not what happened

A.   No I'm glad they found my car I love that car is the car and everything

Q.   All right sir well I appreciate your time

A.   _____

Q.   I don't I don't have anything further

A.   So what's the next step

Q.   I'll give you this information on where it's located you can discuss the claim further with Stacey and

A.   Sure

Q.   Move from today on but

A.   No no problem

Claim #2351850
Page 34
April 24, 2015

Q.  That's all I have today you anything else that you need to know at this point

A.  Not really

Q.  Okay we'll go ahead and conclude and I'm going to turn the recorder off thank you very much

A.  Thank you


Tracy Kensing—SIU
Investigator II

TK/trd